**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| In re: HARLAN J. RATLIFF and THERESA L. RATLIFF, AKA Ratliff Farms, LLC, <br><br> Debtors, <br><br> ——————————— <br><br> HARLAN J. RATLIFF and THERESA L. RATLIFF, <br><br> Appellants/Cross-Appellees, <br><br> v. <br><br> COCHISE AGRICULTURAL PROPERTIES, LLC; et al., <br><br> Appellees/Cross-Appellants. | Nos. 10-60051 and 10-60053 <br><br> BAP No. 10-1011 <br><br> MEMORANDUM[*] |

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Pappas, Dunn, and Jury, Bankruptcy Judges, Presiding

Argued and Submitted March 26, 2012
Tucson, Arizona

————————————

[*]    This disposition is not appropriate for publication and is not precedent except as provided by 9th Cir. R. 36-3.

Before: McKEOWN, CLIFTON, and BYBEE, Circuit Judges.

Harlan ("Jeff") and Theresa Ratliff ("the Ratliffs") entered into a business venture, Cochise Agricultural Properties ("CAP"), with their close friends Todd Campbell and Stephanie McRae ("the Campbells") in which they improved a parcel of land that the Ratliffs had previously purchased and then resold it. CAP's operating agreement recited that the parties made equal capital contributions and had equal participation percentages. The agreement further provided that all distributions were to be used first to pay off any capital contribution, and then divided equally according to the parties' participation percentages (i.e., 50/50). The property, which was originally purchased in February 2004 for $427,539, was officially transferred to CAP in June 2005 and then sold to N.K. of Casa Grande, LLC ("NK") in October 2005 for $3.52 million. The NK contract provided for an initial payment of $1.1 million, which was used to pay off an underlying loan, with the balance payable over five years.

Meanwhile, the Ratliffs took a personal loan from Wells Fargo, which was guaranteed first by a deed of trust on the land and later by the NK note, with the consent of the Campbells and CAP. The Ratliffs subsequently defaulted on the Wells Fargo loan. When the first principal payment from NK was distributed to CAP, Jeff Ratliff, on behalf of CAP, used the proceeds to pay off the Wells Fargo

2

loan, over the protests of the Campbells. Mr. Ratliff then split only the balance of the payment with the Campbells.

The bankruptcy court found that the Ratliffs' initial contribution to CAP was the equity in the land, approximately $38,000, and that the parties intended to form an equal partnership. The bankruptcy court entered judgment for the Campbells and ordered the Ratliffs to pay approximately $178,000 (half of the proceeds from NK used to pay off Wells Fargo), plus fees and costs. The court further found that this was a willful and malicious conversion and that it constituted defalcation by a fiduciary, and was therefore nondischargeable under 11 U.S.C. § 523(a)(4) and (a)(6). The BAP affirmed in part, including the finding of conversion, but reversed the bankruptcy court's finding regarding defalcation under § 523(a)(4). The Ratliffs appeal the BAP's decision affirming the bankruptcy court; the Campbells cross-appeal the decision reversing the bankruptcy court. We have jurisdiction under 28 U.S.C. § 158(d)(1), and we affirm in part and reverse in part.

## I

The Ratliffs first contend that the bankruptcy court erred as a matter of law and fact in determining that the parties made equal capital contributions to CAP. They allege that the bankruptcy court improperly (1) relied on extrinsic evidence to find that the couples intended for an equal division of the proceeds of the NK sale,

3

(2) equated the Ratliffs' capital contribution with the tax basis of the farm, and (3) disregarded the "highly probative" and "dispositive" evidence of value provided by the actual, contemporaneous sale of the property.

1.     The Ratliffs argue that the operating agreement is not susceptible to the interpretation that all distributions were to be made equally. *See Brown & Bain, P.A. v. O'Quinn*, 518 F.3d 1037, 1040 (9th Cir. 2008) (explaining that a court will only consider extrinsic evidence if the contract as written is "reasonably susceptible" to the interpretation offered by the evidence's proponent).  The bankruptcy court did not interpret the contract in this way, however; instead, it found that the initial capital contributions of the two couples were equivalent and, therefore, the distributions, as per the agreement, were to be equal.  In making this determination, the bankruptcy court did not err in using the earlier purchase price as a benchmark for the land's fair market value, especially in light of the strong evidence that the parties intended an equal partnership.

2.     The Ratliffs contend that "[t]he bankruptcy court erred as a matter of law by using the tax basis[, and not the fair market value,] of the farm to determine the amount of the Ratliffs' contribution."  The bankruptcy court did not simply equate the Ratliffs' tax basis in the farm with their capital contribution.  Instead, the bankruptcy court correctly used the purchase price of the property as a starting

point for an estimate of the farm's fair market value. *See* I.R.C. § 1012(a) ("In general[, ] [t]he basis of property shall be the cost of such property . . . ."); Black's Law Dictionary 1691 (9th ed. 2009) (defining "fair market value" as "[t]he price that a seller is willing to accept and a buyer is willing to pay on the open market and in an arm's-length transaction").

3.    The Ratliffs argue that the bankruptcy "court for no good reason disregarded CAP's almost immediate sale of the farm, and $677,000 in irrigation equipment, for $3,520,000 in a transaction that met the conditions of fair market value." According to the Ratliffs, the actual sale price of the farm one month after it was transferred was "highly probative" of the farm's value and should have been considered by the bankruptcy court.

An actual sale between a willing buyer and a willing seller is strong evidence of fair market value. *Morrissey v. Comm'r of Internal Revenue*, 243 F.3d 1145, 1147–48 (9th Cir. 2001). The bankruptcy court considered the sale price, but found this evidence to be less persuasive than other evidence in the record, including intervening improvements to the land made possible by the Campbells' contribution. Because the land was substantially different at the time it was contributed to CAP than when it was sold a month later, the bankruptcy court did

5

not err in rejecting the later sale price as evidence of the fair market value at the time the land was contributed.

## II

Next, the Ratliffs argue that the bankruptcy court erred in finding that the Ratliffs converted CAP's funds, thus rendering the debt nondischargeable. *See* 11 U.S.C. § 523(a)(6). As of August 16, 2006, until it was paid off, the Wells Fargo loan was in default. Pursuant to the pledge agreement executed between the parties and Wells Fargo, after a default Wells Fargo had a right to "[c]ollect any of the Collateral." Thus, because Wells Fargo had a superior right to the funds, the Campbells did not have a right to immediate possession to the funds that were instead paid to Wells Fargo. The payment to Wells Fargo could not serve as the basis for a conversion claim. *See Focal Point, Inc. v. U-Haul Co. of Ariz., Inc.*, 746 P.2d 488, 489 (Ariz. Ct. App. 1986) ("[Conversion is the] 'intentional exercise of dominion or control over a chattel which so *seriously interferes* with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.'" (quoting Restatement (Second) of Torts § 222(A)(1))). The BAP erred in finding otherwise. Because the Ratliffs are not liable for conversion of the portion of the NK proceeds paid to Wells Fargo, the judgment debt in

6

connection with those funds is not nondischargeable pursuant to 11 U.S.C §523(a)(6).

Not all of the funds received from NK were paid to Wells Fargo, however. The first installment received from NK was $479,754.20, but Wells Fargo was paid only $358,902.89, leaving a balance of approximately $120,000.[1] Jeff Ratliff split that money, paying half to the Campbells and keeping half for himself and his wife. But at that point the Ratliffs owed the Campbells for the portion of the NK proceeds that should have gone to the Campbells but was paid to Wells Fargo instead, under the pledge agreement, to satisfy the debt owed to Wells Fargo by the Ratliffs. The portion of the NK payment retained by the Ratliffs could be the subject of a conversion claim in favor of the Campbells and thus support a finding of nondischargeability for a portion of the judgment debt previously held by the bankruptcy court to be nondischargeable.

We remand for further proceedings.

---

[1] These figures are taken from the Bankruptcy Court's December 7, 2009 order, at 13, and are recited again in the BAP's October 13, 2010 order, at 7. However, in footnote 6 on page 14 of the Bankruptcy Court's order, N.K.'s first payment is listed as only $437,168.94, rather than $479,754.20. With the record before us, we cannot determine the reason for the discrepancy but note the issue for further proceedings on remand. The precise amount does not affect our reasoning. What is significant is that there was money remaining from the NK proceeds after the payment to Wells Fargo.

## III

The Campbells cross-appeal the BAP's finding that the debt was not nondischargeable under 11 U.S.C. § 523(a)(4), "for fraud or defalcation while acting in a fiduciary capacity." Because we find that, for the portion of the NK proceeds that were paid to Wells Fargo, Wells Fargo had a superior right to the funds, it was not a breach of any fiduciary duty to honor that claim.

For the portion of the NK proceeds that may be the subject of a conversion claim in favor of the Campbells, we affirm the BAP's finding that the "type of relationship required for non-dischargeability purposes under § 523(a)(4) did not exist" between the Ratliffs and the Campbells. *See Otto v. Niles* (*In re Niles*), 106 F.3d 1456, 1459 (9th Cir. 1997) ("A debt is nondischargeable under 11 U.S.C. § 523(a)(4) where 1) an express trust existed, 2) the debt was caused by fraud or defalcation, and 3) the debtor acted as a fiduciary to the creditor at the time the debt was created." (internal quotation marks omitted)). It is not clear, under Arizona law, that Jeff Ratliff had a fiduciary duty to the Campbells. *See* Ariz. Rev. Stat. § 29-681 (containing no express fiduciary duty requirement); *see also Snoke v. Riso* (*In re Riso*), 978 F2d 1151, 1154 (9th Cir. 1992) ("[E]xceptions to discharge should be strictly construed against an objecting creditor and in favor of the debtor.").

AFFIRMED, in part; REVERSED, in part, and REMANDED.  Each party to bear its own costs and attorney's fees.